IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KENNETH E. SIMS,                      §
                                      §
        Plaintiff,                    §
                                      §
v.                                    §    Civil Action No. H-13-450
                                      §
CAROLYN COLVIN, ACTING                §
COMMISSIONER OF SOCIAL                §
SECURITY ADMINISTRATION,[1]           §
                                      §
        Defendant.                    §


## MEMORANDUM AND RECOMMENDATION

Pending before the court[2] is Plaintiff's Motion for Summary Judgment (Doc. 16), Defendant's Cross-Motion for Summary Judgment (Doc. 13) and the responses filed thereto. The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** Defendant's Cross-Motion for Summary Judgment be **DENIED**, Plaintiff's Cross-Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner.

### I.  Procedural History

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g)

---

[1]     Michael Astrue was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position. Carolyn W. Colvin is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant. See Fed. R. Civ. P. 25(d).

[2]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 5.

and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for supplemental security income benefits under Title XVI of the Social Security Act (the "Act").

Plaintiff was born on August 18, 1962, and was forty-four years old at the alleged onset of his disability.[3]   He has a General Equivalency Diploma (GED) and past employment as a construction worker, a home health care aide and a salesman for a pharmaceutical company.[4]   Plaintiff last worked in February 2009.[5]

Plaintiff claims to be disabled on the basis of cervical neck pain and hypertension.[6]   As Plaintiff's appeal challenges the Commissioner's decision that Plaintiff's cervical spinal stenosis did not meet the applicable severity threshold at step three of the disability analysis, the court recounts only the medical evidence relevant to that issue.

**A.  Medical History**

Plaintiff was treated for neck pain and hypertension at the Access Healthcare Clinic in Apex, North Carolina, between July 2006

---

[3]     Tr. of Admin. Proceedings ("Tr.") 118.

[4]     Tr. 135.

[5]     Tr. 134.

[6]     Id.

and July 2007.[7]  The medical records reflect that Plaintiff's severe neck pain was reasonably well controlled with Lortab, a hydrocodone/acetaminophen medication.[8]

On May 21, 2010, Plaintiff sought treatment at the Harris County Hospital District's Strawberry Health Center ("Strawberry Health Center") in Pasadena, Texas, for chronic neck pain.[9]  A July 2010 magnetic resonance imaging ("MRI") of Plaintiff's cervical spine found "severe left and moderate right neuroforminal narrowing at C6/C7 as well as bilateral moderate neuroforminal narrowing at C3/C4 and C5/C6."[10]  Plaintiff was prescribed naproxen, an analgesic, and Flexeril, a muscle relaxant, for neck pain.[11]

On September 17 and 20, 2010, Plaintiff sought treatment at Ben Taub Hospital's Neurosurgery Clinic ("Neurosurgery Clinic"), for neck pain that radiated into his arms and hands.[12]  Plaintiff judged his pain level to be a ten on a ten-point scale.[13]  He was prescribed methocarbamol, a muscle relaxant, hydrocodone/acetaminophen and naproxen.[14]  Plaintiff was counseled

---

[7]   Tr. 204-22.

[8]   Tr. 215, 217, 219.

[9]   Tr. 231.

[10]   Tr. 236.

[11]   Tr. 232.

[12]   Tr. 239.

[13]   Tr. 371.

[14]   Tr. 239, 369.

about surgery to relieve the compression on his cervical spine.[15]

On November 5, 2010, Plaintiff returned to the Neurosurgery Clinic and continued to complain about severe bilateral radiating pain into his arms.[16] It was noted that Plaintiff was on the waiting list for surgery.[17] Plaintiff again was prescribed hydrocodone/acetaminophen and methocarbamol for pain.[18] On December 17, 2010, Plaintiff returned to the Neurosurgery Clinic and reported that the hydrocodone/acetaminophen medication had not addressed his neck pain, which he judged was eight on a ten-point scale.[19]

On February 28, 2011, Plaintiff returned to the Neurosurgery Clinic for a preoperative checkup.[20] The physician noted chronic neck pain, bilateral distal finger paresthesias, but no extremity weakness.[21] On March 3, 2011, Plaintiff underwent a C4-C6 laminectomy and a C3-C7 partial laminectomy at Ben Taub Hospital.[22]

On March 18, 2011, Plaintiff returned to the Neurosurgery

---

[15]    Tr. 240.

[16]    Tr. 257-58.

[17]    Tr. 257.

[18]    Tr. 259.

[19]    Tr. 254.

[20]    Tr. 283.

[21]    Tr. 277.

[22]    Tr. 272.

Clinic for a postoperative visit.[23]  Plaintiff reported that he still was experiencing neck pain.   In addition to hydocodone/acetaminophen, he was prescribed Percocet, a narcotic pain medication, Flexeril, and Ambien, a sleep medication, and was told to return to the clinic in three months.[24]

On June 17, 2011, Plaintiff returned to the Neurosurgery Clinic.[25]  He reported some improvement on his left side, but continued to complain of intermittent shooting pain into his right arm.[26]

On June 29, 2011, Plaintiff returned to the Strawberry Health Center and reported that he was still suffering from neck pain, which he judged to be an eight on a ten-point scale.[27]  Plaintiff stated that he continued to need pain medication, which he took twice a day.[28]

On December 13, 2011, Plaintiff returned to the Harris County Hospital District's Gulfgate Center and complained of chronic neck pain among other ailments.[29]  His treating physician, Marsha Holleman, M.D., ("Dr. Holleman") gave him a one-month prescription

---

[23]    Tr. 363-64.

[24]    Tr. 363.

[25]    Tr. 302.

[26]    Id.

[27]    Tr. 362.

[28]    Tr. 357.

[29]    Tr. 421.

for hydrocodone/acetaminophen to address the neck pain.[30]

On January 5, 2012, Plaintiff returned to the Gulfgate Center and complained of chronic neck pain, which was only partially relieved by pain medication.[31]  Dr. Holleman ordered a MRI of his cervical spine to evaluate for restenosis.[32]  Plaintiff obtained a renewed prescription for hydrocodone/acetaminophen to be taken twice daily.[33]

On January 19, 2012, Plaintiff underwent a MRI of his cervical spine.[34]  The resulting findings stated:

> Interval laminectomies from C3-C4 through C6-C7 resulting in widening of the spinal canal at this level as compared to prior examination.  There is interval progression of the central disc protrusion at C2-C3 now measuring 5 mm in AP dimension compared to 2 mm on the prior examination with resulting mild flattening of the ventral cord at this level.
>
> There are isolated foci of high T2 signal within the cord at the C3/C4 and C6/C7 levels on the left, unchanged from prior examination.
>
> Redemonstrated are disc osteophyte complexes at C3/C4, C4/C5, C5/C6 and C6/C7.
>
> There is severe foraminal stenosis bilaterally at C6/C7, moderate to the right at C4-C5, and moderate bilaterally at C3/C4 from concentric disc bulges with foraminal components.[35]

---

[30]     Tr. 422.

[31]     Tr. 410, 414, 417.

[32]     Tr. 410.

[33]     Tr. 420.

[34]     Tr. 412.

[35]     Tr. 411.

The MRI results were the last medical entry in the administrative record.

**B.   Application to the Social Security Administration**

On July 8, 2010, Plaintiff filed an application for a period of supplemental security income benefits.[36]   In his application, Plaintiff claimed that he had been disabled since July 7, 2010, based on neck pain and hypertension.[37]

On May 2, 2011, Frederick Cremona, M.D., ("Dr. Cremona"), completed a Physical Residual Functional Capacity ("RFC") Assessment.[38]   Dr. Cremona predicted that by March 2012, one year from his surgery, Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for six hours in an eight-hour day, sit up to six hours in an eight-hour day and engage in unlimited pushing or pulling.[39]   Dr. Cremona found that Plaintiff could never climb ropes or scaffolds, but could frequently balance and kneel and occasionally climb stairs, stoop, crouch and crawl.[40]   Dr. Cremona's RFC determination took into account the "strong likelihood" of persistent post-operative pain.[41]

On January 5, 2012, Plaintiff's treating physician, Dr.

---

[36]   Tr. 22.

[37]   Tr. 134.

[38]   Tr. 293-300.

[39]   Tr. 294, 298.

[40]   Tr. 295.

[41]   Tr. 300.

Holleman, completed a form assessing Plaintiff's physical RFC.[42] Dr. Holleman found that Plaintiff could sit no more than four hours in an eight-hour day and stand and/or walk no more than one hour in an eight-hour day due to neck pain.[43]  She determined that Plaintiff could never lift ten pounds or more, bend, squat, climb, reach up or kneel.[44]  Dr. Holleman determined that Plaintiff was limited, bilaterally, in his abilities to grasp, push and pull and engage in fine manipulation.[45]   Dr. Holleman noted that Plaintiff was prescribed hydrocodone for pain twice a day.[46]

In a "Cervical Spine RFC Questionnaire" also completed on January 5, 2012, Dr. Holleman reported that Plaintiff continued to suffer from cervical spinal stenosis and experienced shooting pain in his right arm and neck pain.[47]  Dr. Holleman noted that Plaintiff reported significant limitation in the movement of his neck and experienced an inability to concentrate based on his neck pain.[48] Dr. Holleman opined that Plaintiff's pain level would "frequently" interfere with the attention and concentration needed to perform

---

[42]   Tr. 392-96.

[43]   Tr. 392.

[44]   Tr. 393.

[45]   Id.

[46]   Tr. 395.

[47]   Tr. 398.

[48]   Tr. 398-99.

even simple tasks.[49]

Dr. Holleman estimated that Plaintiff could sit for thirty minutes, stand for fifteen minutes and stand/walk for less than two hours in an eight-hour day.[50] Dr. Holleman found that, in an eight-hour day, Plaintiff must be allowed to walk at least ninety minutes in five-minute increments, and must also be permitted to shift positions at will from sitting, standing or walking.[51] Dr. Holleman restricted Plaintiff to never looking up or down, turning his head from right or left, holding his head in a static position, twisting, stooping, crouching, climbing stairs or climbing ladders.[52]

Plaintiff's claim was initially denied on October 6, 2010, and Plaintiff moved for reconsideration.[53] After reconsideration was denied, a hearing was held before an administrative law judge ("ALJ") on January 13, 2012.[54]

### C. Hearing

Plaintiff and a vocational expert ("VE") Byron Pettingill ("Pettingill") testified at the January 13, 2012 hearing. The ALJ

---

[49]   Tr. 400.

[50]   Tr. 401.

[51]   Id.

[52]   Tr. 402.

[53]   Tr. 75, 82.

[54]   Tr. 86.

asked if he had the complete medical record.[55]  Plaintiff's counsel stated that in addition to the records submitted at the hearing, Plaintiff had an MRI scheduled for the following week.[56]  The ALJ told Plaintiff that he wanted to be provided the results of the MRI "because that's going to tell us a lot about where you're at now."[57]

Plaintiff testified that he last worked for two years as a caregiver for a quadriplegic individual.[58]  That work required Plaintiff to lift his patient using a hoist.[59]  Although Plaintiff had been experiencing neck pain for over fifteen years, his right side neck pain worsened and he sought medical treatment in 2010.[60] After reviewing the results of an MRI, Plaintiff's doctor instructed Plaintiff to stop working immediately because that type of exertion could result in paralysis.[61]  This advice was echoed by Plaintiff's surgeon who had forbidden Plaintiff's attempting any physical therapy prior to surgery because of the risk of paralysis.[62]

Plaintiff stated that he underwent neck surgery on March 3,

---

[55]     Tr. 37–38.

[56]     Tr. 38.

[57]     Tr. 39.

[58]     Tr. 42.

[59]     Tr. 43.

[60]     Tr. 43–44.

[61]     Tr. 44.

[62]     Tr. 48.

2011, and, in his opinion, the surgery made his condition worse.[63]
Plaintiff explained that his pain level was still a ten on a ten-
point scale and the prescribed pain medication only took "the edge
off."[64]  Plaintiff explained that the constant pain has caused him
to experience depression, anxiety, and an emotional breakdown, and
as a result, he is taking medication for his mental issues.[65]

Upon questioning by the ALJ, Plaintiff stated that he was
presently taking his medications, could sit three to four hours at
a time, could lift no more than five or ten pounds and could walk
"around the block."[66]  He estimated he could stand about an hour at
a time.[67]  Upon questioning by his attorney, Plaintiff stated that
he could stand for less than one hour in an eight-hour day and
could sit for less than one hour before needing to stand up and
move around.[68]  Plaintiff testified that he believed he was unable
to work because of his chronic neck pain, lack of strength and low
energy level, explaining that he felt "wiped out" during the day.[69]
He stated that he did not sleep well at night and had lost over

---

[63]   Tr. 48, 50.

[64]   Tr. 51-52.

[65]   Tr. 56, 63.

[66]   Tr. 57.

[67]   Tr. 58.

[68]   Tr. 62.

[69]   Tr. 61, 65.

fifty pounds because of stress.[70]   Plaintiff also experienced numbness in his fingertips.[71]

Plaintiff reported that he last drove a vehicle before his surgery and disclosed that he needed help with the laundry because bending over resulted in burning pain on his right side.[72]  He was able to make the bed and do light dusting.[73]  For recreation, Plaintiff testified that he was able to read, play cards or games or watch a movie.[74]  He spent most of his day in a recliner and needed assistance from relatives when buying groceries.[75]

The VE testified that Plaintiff's past work as a caregiver was semi-skilled work performed at the medium exertional level.[76]  The VE testified that Plaintiff had the abilities to: (1) lift ten pounds frequently and twenty pounds occasionally; (2) stand and walk four hours of an eight-hour day; (3) sit six hours of an eight-hour day; (4) lift overhead occasionally; (5) frequently use his hands; (6) occasionally bend, stoop, crouch, crawl, balance, twist and squat; (7) get along with others, understand simple

---

[70]    Tr. 64.

[71]    Tr. 65.

[72]    Tr. 59, 63.

[73]    Id.

[74]    Tr. 60.

[75]    Tr. 60-61.

[76]    Tr. 66.  As the ALJ indicated that he was only interested in Plaintiff's prior work as a caregiver, the VE only characterized that employment. Id.

instructions and adapt to workplace changes.[77]  The VE stated that
a hypothetical person with Plaintiff's limitations could not
perform any of his past work and had no transferrable skills.[78]  The
VE opined that a person with Plaintiff's restrictions could perform
work as a small products assembler, office helper or hardware
assembler.[79]

The VE conceded that if the hypothetical person had to change
positions from sitting to standing every thirty minutes, and was
further restricted to no repetitive movements, simple grasping,
pushing, pulling or fine manipulation bilaterally, as well as no
bending, squatting, climbing, reaching up or kneeling, there would
be no jobs in the national economy that he could perform.[80]  The VE
testified that if the hypothetical person was able to sit for six
hours out of an eight-hour day but was restricted to lifting less
than ten pounds, the person was not employable.[81]

**D. Commissioner's Decision**

On January 27, 2012, the ALJ issued his decision.[82]  The ALJ
found that Plaintiff had not engaged in substantial gainful
activity since July 8, 2010, and that he had multiple severe

---

[77]   Tr. 66-67.

[78]   Tr. 67.

[79]   Tr, 67-68.

[80]   Tr. 69.

[81]   Id.

[82]   Tr. 22-31.

impairments: cervical spinal stenosis status post-laminectomy, hypertension, major depressive disorder and anxiety.[83] The ALJ found that Plaintiff's severe impairments, individually or collectively, did not meet or medically equal any of the listings of the regulations[84] (the "Listings").[85] The ALJ devoted significant discussion to Plaintiff's mental impairments but failed to provide any reasoning for his conclusion that Plaintiff did not meet the Listings for his physical impairments.[86]

At step four, the ALJ found that Plaintiff was not able to perform his past relevant work as a caregiver but had the physical RFC to lift or carry twenty pounds occasionally, to lift or carry ten pounds frequently, to stand and/or walk, with normal breaks, for a total of four hours in an eight-hour day, to sit six hours in an eight-hour day, and to engage in unlimited push/pull and tasks requiring gross or fine manipulations.[87]

Additionally, the ALJ found that Plaintiff was able to get along with others, understand simple instructions, concentrate and perform simple tasks, respond to workplace changes and supervision

---

[83]    Tr. 24. The ALJ rejected Plaintiff's claims of disability stemming from back pain and heart problems as not supported by the medical evidence. *Id.*

[84]    Tr. 24-25.

[85]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[86]    Tr. 24.

[87]    Tr. 26.

in a limited public/employee-contact setting.[88]  The ALJ recognized that Plaintiff was limited to: (1) occasional pushing, overhead lifting, climbing stairs, bending, stooping, crouching, crawling, balancing, twisting and squatting; and (2) no running or climbing ladders, ropes or scaffolds.[89]  The ALJ determined that Plaintiff had the RFC to perform the requirements of a small products assembler, an office helper or a hardware assembler.[90]

In coming to his conclusions concerning Plaintiff's physical RFC, the ALJ focused on Plaintiff's March 2011, post-surgery statements that he was doing well and ready to be discharged from the hospital and his June 2011 statement that he experienced improvement on his left-sided pain while complaining of intermittent shooting pain in his right arm.[91]  In so finding, the ALJ discounted the opinion of Plaintiff's treating physician, Dr. Holleman, finding that her opinion was "inconsistent with the objective medical evidence of record."[92]

Plaintiff appealed the ALJ's decision and supplemented the record with additional medical records.[93]  On January 18, 2013, the Appeals Council denied Plaintiff's request for review, thereby

---

[88]    Id.

[89]    Id.

[90]    Tr. 31.

[91]    Tr. 27.

[92]    Tr. 29.

[93]    Tr. 5.

transforming the ALJ's decision into the final decision of the Commissioner.[94] Plaintiff then timely sought judicial review of the decision by this court.

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

---

[94]    See Tr. 1-4.

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 416.920.  By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth.  Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999).  If the Commissioner satisfies her step-five burden of proof, the burden shifts back to the claimant to prove he cannot perform the work suggested.  Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.  Greenspan, 38 F.3d at 236.

**B.  Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might

accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance."  Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision failed to discuss the medical evidence at step three of the disability analysis and ignored evidence which supported a

finding that Plaintiff met Listing 1.04.[95]   Plaintiff also argues that the ALJ failed to give controlling weight to the opinion of Plaintiff's treating physician without engaging in the required analysis.[96] Defendant argues that the decision is legally sound and is supported by substantial evidence.

### 1.  __Step Three Analysis__

As mentioned above, if a claimant is found to have a severe impairment at step two, the ALJ must consider at step three whether the claimant's impairment meets or equals one of the Listings.  If the claimant's impairment meets or equals a Listing, the disability inquiry ends and the claimant is presumptively entitled to benefits.  Bowling, 36 F.3d at 435.  The claimant bears the burden of proof on this issue.  Selders, 914 F.2d at 619.

Plaintiff contends that his cervical spine impairment met Listing 1.04A.  That Listing states, in relevant part:

> 1.04  Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
> With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and

---

[95]    Doc. 16-1, Mem. in Support of Pl.'s Mot. for Summ. J. p. 1.

[96]    Id.

supine).

20 C.F.R. Part 404, Subpt. P, App. 1 § 1.04(A).

In support of his argument that he meets this Listing, Plaintiff cites medical records that show that he had been diagnosed with cervical spine stenosis both before and after his March 2011 spinal fusion surgery.[97] Plaintiff's most recent MRI documented that, as of January 2012, he suffered from moderate-to-severe cervical spine stenosis.[98] Cervical spine stenosis would satisfy the first factor of the Listing 1.04.

Turning to the second factor of the Listing, Plaintiff's medical records also show that, other than for a short time immediately following his surgery, Plaintiff continued to suffer from severe neck pain. For example, in June 2011, he complained of "upper back tingling pains sometimes radiating to the lateral arm to the lateral wrist."[99]  On that occasion he sought pain medication.[100]  His treating physician documented Plaintiff's complaints of chronic post-surgical back and arm pain.[101]

---

[97]    See Tr. 236 ("There is severe left and moderate right neuroforminal narrowing at C6/C7 as well as bilateral moderate neuroforaminal narrowing at C3/C4 and C5/C6.")  This record was dated July 6, 2010 see id.; Tr. 413 ("Severe foraminal stenosis bilaterally at C6/C7 to the right at C4-C5, bilaterally at C3-C4 from concentric disc bulges with foraminal components.  No significant change from prior examination.")  This record was dated January 19, 2012. Id.

[98]    Tr. 413.

[99]    Tr. 357.

[100]   Id.

[101]   Tr. 359, 398-400, 414, 419-22.

At the hearing before the ALJ, Plaintiff testified to numbness in his fingertips and shooting pain down his right arm and side.[102] Plaintiff's medical records support his claims of shooting pain. A MRI taken prior to Plaintiff's fusion surgery noted "chronic cord compression,"[103] and the most recent MRI, taken in January 2012, noted "no significant change from prior examination."[104]

At step three, the ALJ stated that "no treating, examining or non-examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment."[105] However, at the time that the ALJ issued his decision, a July 6, 2010 MRI noted moderate to severe cervical spine stenosis[106] and medical records documented shooting pain.[107]  The ALJ failed to discuss this evidence and erred in failing to do so.

The January 2012 MRI and an updated RFC assessment were submitted to the Appeals Council, which then made a critical error in considering the new evidence.[108]  The Appeals Council stated:

> We looked at evidence associated with the record . . . consisting of medical records from Gulfgate Community Health Center for the period April 26, 2012, through

---

[102]    Tr. 63, 65.

[103]    Tr. 236.

[104]    Tr. 413.

[105]    Tr. 25.

[106]    Tr. 236.

[107]    Tr. 357.

[108]    Tr. 5.

September 19, 2012.  The [ALJ] decided your case through January 27, 2012.  This new information is about a later time.  Therefore, it does not affect the decision about whether you were disabled beginning on or before January 27, 2012.[109]

The record reflects, however, that the Cervical Spine Residual Functional Capacity assessment from Dr. Holleman was dated January 5, 2012, and medical records from the Gulfgate Community Health Center/Ripley Clinic were for the period December 13, 2011, through January 19, 2012.[110]  Thus, the additional records submitted to the Appeals Council pre-dated the decision of the ALJ and should not have been summarily rejected by the Appeals Council.

A court may remand an action to the Commissioner when new evidence becomes available and "there is a reasonable probability that the new evidence would change the outcome of the decision." Joubert v. Astrue, 287 F. App'x 380, 383 (5th Cir. 2008)(unpublished)(quoting Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995)).  Here, the additional records submitted show that Plaintiff was still suffering from "severe to moderate" cervical spine stenosis and right arm shooting pain,[111] and that Plaintiff was "incapable of even 'low stress' jobs,"[112] was limited to

---

[109]    Tr. 2.

[110]    Tr. 6.

[111]    Tr. 398.

[112]    Tr. 400.

22

standing fifteen minutes at a time,[113] and could "never" lift less than ten pounds.[114]

The court finds that in light of the post-hearing submissions, the Commissioner's determination at step three that "no treating, examining, or non-examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment" is not supported by substantial evidence and that there is a reasonable probability that the new evidence could change the outcome of the Commissioner's decision.  The action should be remanded to the Commissioner for further consideration of the new medical information.

Based on these findings and the court's recommendation that this action be remanded, the court does not reach Plaintiff's alternative arguments.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** Plaintiff's Cross-Motion for Summary Judgment be **GRANTED**, Defendant's Cross-Motion for Summary Judgment be **DENIED** and this action be **REMANDED** to the Commissioner for further consideration in light of this Memorandum and Recommendation.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days

---

[113]     Tr. 401.

[114]     <u>Id.</u>

from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this <u>4th</u> day of June, 2014.

Nancy K. Johnson
United States Magistrate Judge

24